IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TYRONDA B., <br><br> Claimant, <br><br> v. <br><br> ANDREW SAUL, Commissioner <br> of Social Security, <br><br> Respondent. | No. 19 CV 1244 <br><br> Magistrate Judge Jeffrey T. Gilbert |

**MEMORANDUM OPINION AND ORDER**

Claimant Tyronda B.[1] ("Claimant") seeks review of the final decision of Respondent Andrew Saul,[2] Commissioner of Social Security ("Commissioner"), denying Claimant's application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"). Pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, the parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings, including entry of final judgment. [ECF No. 9]. The parties have filed cross-motions for summary judgment [ECF Nos. 13, 24] pursuant to Federal Rule of Civil Procedure 56. This Court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c). For the reasons discussed below, Claimant's Motion for Summary Judgment [ECF No. 13] is granted, and the Commissioner's Motion [ECF No. 24] is denied.

---

[1] Pursuant to Northern District of Illinois Local Rule 8.1 and Internal Operating Procedure 22, the Court will identify the non-government party by using his or her full first name and the first initial of the last name.

[2] Andrew Saul was sworn in as Commissioner of Social Security on June 17, 2019. Pursuant to Federal Rule of Civil Procedure 25(d), the Court has substituted Commissioner Saul as the named defendant.

**PROCEDURAL HISTORY**

On October 14, 2014, Claimant protectively filed a Title XVI application for SSI benefits alleging disability beginning on August 8, 2008. (R. 181-84). The claim was denied initially and upon reconsideration, after which Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (R. 96-112). On June 19, 2017, Claimant appeared and testified at a hearing before ALJ Laurie Wardell. (R. 37-52). The ALJ also heard testimony on that date from vocational expert ("VE") Julie Bose. (R. 13-29).

On September 25, 2017, the ALJ denied Claimant's claim for SSI after considering her limitations. (R. 13-22). In finding Claimant not disabled, the ALJ followed the five-step evaluation process required by Social Security regulations for individuals over the age of 18. See 20 C.F.R. § 416.920(a). At step one, the ALJ found that although Claimant engaged in some "notable work activity" since her alleged disability onset date, she had not engaged in substantial gainful activity since the date of her application for benefits, October 14, 2014. (R. 15-16). At step two, the ALJ found that Claimant had a severe impairment or combination of impairments as defined by 20 C.F.R. 404.1520(c) and 416.920(c). (R. 16). Specifically, Claimant has borderline intellectual functioning and depression, which the ALJ concluded significantly limit Claimant's ability to perform basic work activities. (R. 16). The ALJ also noted that Claimant had additional non-severe impairments, including obesity, a prior history of alcohol abuse, physical limitations associated with pins placed in her legs following a car accident as a child, and dizziness. (R. 16-17).

At step three, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 16). Specifically, the ALJ noted that Claimant did not meet or medically equal the criteria of listing 12.02 (neurocognitive disorders), 12.04 (depressive,

2

bipolar and related disorders), 12.05 (intellectual disorder), and 12.06 (anxiety and obsessive-compulsive disorders). (R. 17). In arriving at this conclusion, the ALJ relied heavily on several consultative examinations that documented Claimant's limitations, including a psychological consultative examination with Dr. Alan Long[3] in 2008, an internal medicine consultative examination with Dr. Dante Pimentel in 2015, a psychological consultative examination with Dr. Dr. Mark Amdur in 2015, a consultative examination with Dr. Miriam Quinn in 2016, and psychological testing that occurred at the City Colleges of Chicago's Wellness Center in 2016. (R. 17). Although the ALJ ultimately concluded Claimant did not meet the criteria of any of the severe impairments described above, she did note that Claimant had moderate limitations in (1) understanding, remembering, or applying information, (2) interacting with others, (3) concentrating, persisting, or maintaining pace, and (4) adapting or managing herself. (R. 17-18)

The ALJ then found Claimant had the residual functional capacity[4] ("RFC") to:

"perform a full range of work at all exertional levels but with the following nonexertional limitations: she can perform work involving only simple, routine and repetitive tasks, simple work related decisions, occasional workplace changes, occasional contact with supervisors and coworkers, no contact with the general public, no written instructions and no production rate pace tasks." (R. 21).

Based on this RFC, the ALJ found at step four that Claimant did not have any past relevant work. (R. 27). Although the ALJ noted at step three that Claimant previously worked as a caregiver and as an ambassador for her school, which involved helping students sign in for activities and serving popcorn, the ALJ did not find this past work constituted substantial gainful activity.

---

[3] The ALJ makes several references to medical evidence from "Dr. Lang" in her opinion. (R. 17, 23); For clarity of the record, the Court believes the ALJ is referring to Dr. Alan Long, who conducted a psychological evaluation of Claimant on August 14, 2008. (R. 315-320)

[4] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. § 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite [her] mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008).

Finally, at step five, the ALJ concluded that Claimant was capable of making a successful adjustment to other work that exists in significant numbers in the national economy, including as a cleaner, laundry worker, or a laundry folder. (R. 28). The ALJ acknowledged Claimant had nonexertional limitations, but ultimately concluded that Claimant would nevertheless be able to transition to work that exists in significant numbers in the national economy consistent with her residual functional capacity and the VE's recommendation. (R. 28).

For the above reasons, at step five, the ALJ found Claimant was not disabled under the Act. (R. 28-29). The Appeals Council declined to review the matter on December 21, 2018 (R. 1-3), making the ALJ's decision the final decision of the Commissioner and, therefore, reviewable by this Court. 42 U.S.C. § 405(g); *see, e.g., Smith v. Berryhill,* 139 S. Ct. 1765, 1775 (2019); *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## STANDARD OF REVIEW

A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). Judicial review is limited to determining whether the ALJ's decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching his or her decision. *See Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

Substantial evidence "means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotations omitted); *see also, Richardson v. Perales*, 402 U.S. 389, 401 (1971). A "mere scintilla" of evidence is not enough. *Biestek,* 139 S. Ct. at 1154; *Scott v. Barnhart*, 297

F.3d 589, 593 (7th Cir. 2002). Even where there is adequate evidence in the record to support the decision, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (internal quotations omitted). In other words, if the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008) (internal quotations omitted). The reviewing court may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

## ANALYSIS

Claimant argues that the ALJ erred in four of her conclusions, each of which, according to Claimant, is reversible error in its own right. [ECF No. 14]. With respect to the RFC assessment and the ALJ's hypothetical to the VE, Claimant argues that neither adequately accommodated Claimant's limitations in concentration, persistence, and pace. Claimant further contends the ALJ erred by "selectively crediting" the opinion of Dr. Mark Amdur, who conducted a psychiatric evaluation of Claimant in 2015, as well as in allegedly failing to address the opinion of Dr. Mirjam Quinn. Finally, Claimant argues that the ALJ failed to adequately address conflicts she perceives in the vocational evidence.

Because the ALJ failed to account for Claimant's moderate limitations in concentration, persistence, and pace, the Court hereby remands the case for further proceedings on those grounds. The other three issues raised by Claimant will necessarily be affected by the ALJ's need to revisit

5

the medical and other evidence on remand, and the Court therefore declines to address them on the merits, as explained in more detail below.

### I. The RFC Assessment and Claimant's Limitations in Concentration, Persistence, and Pace

Claimant first argues that the ALJ failed to account for her deficiencies in concentration, persistence, and pace in both the RFC assessment and hypotheticals posed to the VE. All of Claimant's limitations must be incorporated into both the hypothetical posed to the VE and the ALJ's RFC assessment. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015*); Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014). Specifically, the hypothetical must account for documented limitations of "concentration, persistence or pace." *Ramirez v. Barnhart*, 372 F.3d 546, 554 (3d Cir. 2004). "Though an RFC assessment need not recite the precise phrase 'concentration, persistence, or pace,' any alternative phrasing must clearly exclude those tasks that someone with the claimant's limitations could not perform." *Paul v. Berryhill*, 760 F. App'x 460, 465 (7th Cir. 2019) (citing *Moreno v. Berryhill*, 882 F.3d 722, 739 (7th Cir. 2018)).

In this case, the ALJ concluded that Claimant had moderate limitations in concentration, persistence, or maintaining pace. (R. 26). This conclusion was based on the ALJ's review of the medical evidence and hearing testimony and is, in the Court's view, supported by substantial evidence. Claimant's responses during her evaluations were slow and she "struggled significantly to read information" and maintain concentration on particular tasks. (R. 19). Although Claimant was sometimes able to concentrate on reading, she had difficulty concentrating on television and her "ability to concentrate was impacted by depressive preoccupations." (R. 19). Claimant also had a "short attention span," and according to Dr. Amdur, could only be focused on tasks with some effort. (R. 19). She was described as not finishing tasks that she started; for example, during a 2016 consultative evaluation, Claimant became "visibly frustrated and was extremely hard on

herself when completing tasks she found difficult during testing." (R. 19). As the ALJ noted, she "struggled significantly to read information and became so frustrated that testing was discontinued." (R. 19).

Claimant also received significant academic accommodations that are further indicative of moderate limitations in concentration, persistence, or maintaining pace. While she was enrolled as a student at Kennedy-King College, Claimant was working with the Disability Access Center and was provided a note taker, the use of a digital recorder, extended test time, and a reader on tests. (R. 294). A psychological evaluation done at City Colleges of Chicago, of which Kennedy-King College is a part, provided more detail as to what accommodations were recommended for Claimant in an academic setting. (R. 329-338). City Colleges recommended Claimant receive additional time on both exams and classroom assignments, as well as that she continue to meet with tutors on a weekly basis for assistance out of class. (R. 337). City Colleges also indicated that Claimant should have all academic material broken down into smaller increments, rather than given to her en masse, and that she should receive extra instructions in multiple formats – i.e. written and orally – repeated as often as needed. (R. 337). Finally, Claimant was advised to take her tests in a different room with minimal distractions. (R. 337).

Claimant's medical history, made part of the administrative record on appeal, supports the ALJ's conclusion regarding Claimant's moderate limitations in concentration, persistence, or maintaining pace. Dr. Rudolph examined Claimant on June 11, 2015 and observed that while Claimant was capable of caring for her own basic needs, such as doing laundry, washing dishes, and house cleaning, she was not capable of managing her own finances and that her "prognosis and her insight are limited." (R. 295). Dr. Amdur examined Claimant on October 6, 2015 and noted that Claimant suffered from "chronic and recurrent" depressive preoccupations that "limit her

7

ability to concentrate and tolerate stress." (R. 313). Dr. Amdur explained that "[c]ognitive intellectual impairments further impair [Claimant's] ability to comprehend" and that "[d]eficits in visuospatial functioning would interfere with her ability to perform simple manual tasks." (R. 313). When Dr. Quinn evaluated Claimant on February 29, 2016, she similarly observed that Claimant was experiencing "significant memory deficits that could be associated with impairment in cognitive functioning and daily living," as well as "significant difficulty with auditory memory; that is, tasks that require listening to, processing, and repeating orally presented information." (R. 324). Dr. Quinn further noted that Claimant will "struggle with tasks that require quick thinking and memorization" and that because "new information is getting encoded into the claimant's memory in an inefficient manner," "it would likely be "difficult for the claimant to function effectively in most professional environments." (R. 324). While Dr. Quinn concluded that Claimant could "usefully participate in the management of her own funds," she emphasized that Claimant would require "close assistance and supervision" to do so. (R. 325).

Dr. Larry Lichtenstein and Kia Watkins, a Diagnostic Practicum Intern, examined Claimant on January 4, 2016 and January 29, 2016 as part of Claimant's enrollment at City Colleges of Chicago to help Claimant better understand her learning disabilities. (R. 329-338). Claimant was noted to be "visibly frustrated and extremely hard on herself when completing tasks that she found difficult during testing" and became "so upset with her reading difficulty during the mental status examination that the examiner was forced to discontinue." (R. 332). The testing process itself was "daunting and overwhelming" for Claimant, as evidenced by her repeated "sighing with frustration, placing her head in her hands, appearing emotionally upset, and asking how long will the process take on different occasions." (R. 332-33). Furthermore, although Claimant did appear to have "some skills in processing information in a quick and efficient

8

manner," her ability to work quickly on simple tasks was not as well developed in comparison to individuals in her age group. (R. 334). She was also noted to be "likely to significantly struggle on tasks that require her to solve novel problems and utilize abstract, visual-spatial skills," and was "prone to have difficulty encoding information and storing it in her short [term] memory to retrieve it and output a response." (R. 334).

As shown above, the ALJ was aware of Claimant's limitations in concentration, persistence, and pace when she posed her hypotheticals to the VE and formulated the RFC. The ALJ's first hypothetical asked whether there would be any work for an individual of Claimant's same age and education, provided the work was limited to "simple, routine, repetitive tasks, simple work related decisions, occasional changes, occasional supervisor, coworker, no public, and needs instructions orally rather than in writing…[and] no production rate pace." (R. 53). The second hypothetical added an additional limitation of "daily task reminders." (R. 53). Considering the limitations in the first hypothetical, the VE opined that there would be "simple routine light or medium work activities" available to Claimant in the national economy, such as a Laundry Worker or Laundry Folder. (R. 53). The VE stated that those jobs would still exist with the added limitation of daily task reminders, but noted that if the task reminders were necessary on a more frequent basis, such as hourly, then there would no longer be jobs available in the national economy for a person with Claimant's limitations. (R. 53-54). The ALJ subsequently determined that Claimant had the residual functional capacity ("RFC") to:

> "perform a full range of work at all exertional levels but with the following nonexertional limitations: she can perform work involving only simple, routine and repetitive tasks, simple work related decisions, occasional workplace changes, occasional contact with supervisors and coworkers, no contact with the general public, no written instructions and no production rate pace tasks." (R. 21).

9

Although Claimant's limitations in concentration, persistence, and pace were well-documented, both the RFC and the hypotheticals given to the VE failed to properly consider them, nor did the ALJ connect the evidence to her conclusion through an accurate and logical bridge. *See, e.g., Berger v. Astrue,* 516 F.3d 539, 544 (7th Cir. 2008). While the ALJ did not use the words concentration, persistence, and pace in her hypothetical, she did attempt to use "alternative phrasing" to exclude tasks that someone with Claimant's limitations in those areas would not be able to perform. The following three restrictions in the ALJ's hypothetical were targeted towards concentration, persistence, and pace: (1) "simple, routine, and repetitive tasks," (2) "a simple work related decisions," (3) "occasional workplace changes, occasional contact with supervisors and coworkers, [and] no contact with the general public," (4) "no written instructions," and (5) "no production rate pace tasks." (R. 21).

Taking each accommodation offered by the ALJ in turn, limiting Claimant's work to simple, routine, and repetitive tasks, with only simple work related decisions, does not accommodate her moderate limitation in concentration, persistence, and pace. *DeCamp v. Berryhill*, 916 F.3d 671 (7th Cir. 2019); *Radosevich v. Berryhill*, 759 F. App'x 492, 495 (7th Cir. 2019); *Paul v. Berryhill*, 760 F. App'x. 460, 465 (7th Cir. 2019); *Varga,* 794 F.3d at 814-15; *Yurt*, 758 F.3d at 858–59; *Stewart v. Astrue*, 561 F.3d 679, 685 (7th Cir. 2009) (emphasizing that the "Commissioner continues to defend the ALJ's attempt to account for mental impairments," i.e. limitations in concentration, persistence, or pace, "by restricting the hypothetical to 'simple" tasks,' and we and our sister courts continue to reject the Commissioner's position."); *Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004).

The Seventh Circuit has explained that "in most cases employing terms like simple, repetitive tasks on their own" is not enough to account for a claimant's limitations in concentration,

persistence, and pace. *Winsted*, 923 F.3d at 477. This is because, as the Social Security Administration has itself recognized, the "response to the demands of work is highly individualized," and therefore, "the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's condition may make performance of an unskilled job as difficult as an objectively more demanding job." SSR 85–15. This determination is, however, still to be made on a case-by-case basis, as it is possible that an RFC limited to simple, routine, and repetitive tasks may account for deficits in concentration, persistence, and pace when the record demonstrates that the RFC adequately captures a claimant's mental limitations. *Jozefyk*, 923 F.3d at 495, 497-98 (where claimant's impairments only surfaced in social settings, the ALJ did not err in limiting claimant to "simple, routine, repetitive tasks" that required limited-to-no social interaction); *Dudley*, 773 F. App'x at 842 (holding limitation to "simple, routine and repetitive tasks" and "work requiring the exercise of only simple judgment" accommodated claimant's stress- and panic-related impairments and concentration difficulties).

      Here, there is no evidence in the record, nor did the ALJ explain, how Claimant's issues in maintaining focus and concentration relate to whether a task is simple or complicated. (R. 78). Claimant's ability to stay on task is different than her ability to perform simple tasks, and the ALJ's limitation does not capture the former. *See, e.g., O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010). Nor does it capture the latter, given the evidence in the record suggesting Claimant struggles with precisely the types of simple, manual tasks to which the ALJ limited her. (R. 313) (Claimant's "[d]eficits in visuospatial functioning would interfere with her ability to perform simple manual tasks."). Similarly, the ALJ did not provide any guidance to the VE or this Court as to how the nature of a task – whether it is simple, routine, or repetitive – affects, beyond on a

superficial level, the amount of time it would take Claimant to complete it. (R. 313)("[Claimant has] general cognitive slowing and she would have difficulty performing at competitive rates."); *see, e.g., Ramirez*, 372 F.3d at 554 (restriction to simple one or two-step tasks does not take into account deficiencies in pace where "[m]any employers require a certain output level from their employees over a given amount of time, and an individual with deficiencies in pace might be able to perform simple tasks, but not over an extended period of time."). The ALJ's failure to recognize these distinctions and incorporate them into the hypothetical left the VE, and ultimately this Court, at an impermissible disadvantage in accurately assessing Claimant's work potential.

The ALJ's restriction to "occasional workplace changes, occasional contact with supervisors and coworkers, [and] no contact with the general public" similarly misses the mark. Such accommodations deal with workplace adaptation, not concentration, persistence, and pace. *Varga,* 794 F.3d at 815 ("'Few if any work place changes' with limited 'interaction with coworkers or supervisors' deals largely with workplace adaptation, rather than concentration, pace, or persistence."); *see also, Mischler v. Berryhill,* 766 F. App'x 369, 376 (7th Cir. 2019); *Moreno v. Berryhill,* 882 F.3d 722, 730 (7th Cir. 2018). Nor does eliminating "production rate pace tasks" account for Claimant's limitations in pace, especially where, as here, the ALJ leaves that term undefined. *See, e.g., Varga,* 794 F.3d at 815 (finding the ALJ's hypothetical deficient and noting the ALJ's failure to define "fast-paced production" was "problematic" and rendered it "impossible" for the VE to accurately assess limitations in pace); *Mischler*, 766 F. App'x at 376 (failure to define "piecework" or "fast-moving assembly line work" "makes it impossible for a VE to assess whether a person with those limitations 'could maintain the pace proposed.'"); *DeCamp v. Berryhill*, 916 F.3d 671, 675–76 (7th Cir. 2019) (rejecting restrictions of "unskilled work" with no "fast-paced production line or tandem tasks" "because there is no basis to suggest that

12

eliminating jobs with strict production quotas or a fast pace may serve as a proxy for including a moderate limitation on concentration, persistence, and pace."). Without definition, the term "production rate pace tasks" leaves both the VE and this Court to guess whether Claimant could perform at the pace required of a laundry worker or laundry folder. If Claimant's deficiencies in pace, as repeatedly documented in the medical evidence and through Claimant's own testimony, had been included in the hypothetical, the VE may have changed her answer as to whether there were jobs in the local or national economy that Claimant could perform. This is especially true where eliminating production-rate tasks was the only accommodation made for Claimant's limitations in pace.

Finally, the ALJ's restriction that Claimant should receive "no written reminders" is insufficient to capture any of Claimant's limitations in concentration, persistence, and pace. As an initial matter, while reminders may relate to concentration and persistence, they do not account for pace, with which Claimant has documented issues. Furthermore, to the extent reminders could possibly ameliorate issues with concentration and persistence, the ALJ did not actually provide for any reminders to be given to Claimant during the day – only that if there were to be given, it should not be done in writing. Not only does this fail to capture any of Claimant's limitations, but it runs contrary to medical evidence in the record that indicates Claimant would have "significant difficulty with auditory memory; that is, tasks that require listening to, processing, and repeating orally presented information." (R. 324). Limiting Claimant to oral reminders simply does nothing to address Claimant's impaired ability to stay on task and move from one task to the next over a fixed schedule, as would be required in a competitive work environment.

In defending her accommodations for Claimant's limitations in concentration, persistence, and pace, the ALJ leaned heavily on evidence that Claimant had previously worked as a caregiver

13

and as an ambassador for her school, which involved helping students sign in for activities and serving popcorn. (R. 27). Yet the record shows that Claimant only performed both work-related functions aided by greater accommodation than that which the ALJ provided in her RFC. When Claimant worked as a "caregiver," she worked directly with her mother and only worked in that capacity for a month. (R. 45). Similarly, when Claimant worked at her college, she ran errands directly for the Dean or would sit in the gymnasium and serve popcorn to student. (R. 44). Claimant therefore was either receiving direct and constant supervision or performing infrequent manual tasks that did not require Claimant to sustain the same level of concentration, persistence, or pace as the jobs proposed by the ALJ in the national economy, such as a laundry worker or laundry folder.

The ALJ further cited the fact that Claimant received "good grades in college" as "other evidence in the record [that] demonstrates that the claimant would be able to perform simple, routine and repetitive tasks," (R. 27), despite the fact that the VE herself cautioned against equating academic success and "test taking with job tasks because they're very dissimilar experiences." (R. 56-57). Yet even were the two metrics comparable, the record does not support the ALJ's blanket assertion that Claimant had "good grades" at Kennedy-King College. Claimant received significant academic support and accommodation from the Disability Access Center at Kennedy-King College, but still struggled with her classes by any objective measure. For example, when Claimant testified before the ALJ in June of 2017, she had just finished her Spring 2017 semester. During that semester, although Claimant received a "B" in Fundamentals of Speech Communication, she had previously failed the same course in 2009 and unsuccessfully attempted it again in 2015. (R. 287-88). She also repeated another class, a one-credit course named Level Up (Math), and received a "B." (R. 287-88). She received a "D" in Human Biology, a "B" in Theater

14

Diversity in the U.S., and an "F" in her Introduction to Visual Communications class. (R. 287). Therefore, even were the Court to consider Claimant's grades an accurate barometer of Claimant's ability to perform simple, routine, and repetitive tasks, as the ALJ proposes (and as the VE says should not be done), Claimant's grades far from prove that point.

Therefore, without more targeted explanation by the ALJ, the Court cannot reconcile the ALJ's finding that Claimant had moderate limitation regarding concentration, persistence, and pace with the accommodations in the RFC. Remand on this point is required.

## II. Remaining Claims

Because the Court is remanding on the error identified above, it need not explore in detail the other arguments posited by Claimant on appeal since that analysis would not change the result in this case. The Commissioner, however, should not assume that the Court agrees with the ALJ's analysis of those issues. Similarly, Claimant should make no assumptions either. Rather, it is simply unnecessary for the Court to lengthen this Memorandum Opinion and Order by addressing Claimant's other arguments in a case that is being remanded anyway. This is particularly true where the Court's remand will affect the ALJ's RFC assessment and, as a result, the other issues Claimant has raised.

In conclusion, the Court expresses no opinion about the decision to be made on remand but encourages the Commissioner to do what is necessary to build a logical bridge between the evidence in the record and his ultimate conclusions, whatever those conclusions may be. *See, e.g., Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) ("On remand, the ALJ should consider all of the evidence in the record, and, if necessary, give the parties the opportunity to expand the record so that he may build a 'logical bridge' between the evidence and his conclusions"); *see Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 693 (7th Cir. 1994).

## CONCLUSION

For the reasons discussed above, Claimant's Motion for Summary Judgment [ECF No. 13] is granted, and the Commissioner's Motion [ECF No. 24] is denied. This matter is remanded to the Social Security Administration for further proceedings consistent with this Memorandum Opinion and Order.

It is so ordered.

_____
Jeffrey T. Gilbert
United States Magistrate Judge

Dated: August 4, 2020